I take the matter under advisement and the next case is U.S. v. Anthony Robinson. Good morning, Your Honor. My name is Tim Huff and I represent the Appellant Role Institute. Mr. Stucke, I'd like to reserve four minutes for rebuttal if I may. Okay. Your Honor, Sir, you aren't taking any chances in this court. I'd like to initiate this by addressing the constructive discharge claim, if I might. The evidence here You can try to stay in front of the mic because we'll lose you a little bit. Sorry. Okay. The evidence here is that Mr. Stucke had worked in the prison system for a long time. It was 28 years. He'd come over to FiliCorps in about 2004 and he served as an industry shop supervisor. There was a gentleman by the name of Mr. Filler who was the assistant director. We'll worry the facts. Maybe you can help me. Sure. In terms of the substance of things, speaking only for myself, it seems to me you have a very, very strong argument. This should never have been dismissed on summary judgment. But in terms of the – and, again, that's only one vote. That's not going to get you a victory here. But in terms of the constructive discharge and the hostile work environment, I'm having a lot of trouble figuring out how, on this record, it is not error to dismiss on those two grounds, on constructive discharge and on the hostile work environment. I think you have to go back and look at the exact facts of how the position became available. And I think the unusual thing here, Your Honor, is that Ms. Dougherty appeared and gave testimony, which really supports his claim of constructive discharge. And she's sort of the employer person. She was the director. So she recruits Mr. Stuckey to come into the position and says we're going to work around the educational requirement. The former Commissioner Leon King had put that requirement into the specs. And so he's told that specifically and then he goes in and by her testimony he does a good job. She says okay. And then she says, well, no, actually it was a good job that he did. And then for whatever reason she's called into a meeting with Deputy Commissioner Hammond and says, well, you've got to tell him we're not going to change the educational requirements. That's disparate treatment. I'm sorry? That's disparate treatment. Yes, Your Honor. And it's – the city's argument is no one changed the conditions of employment, no one told him to resign, but they did. They called him into a meeting and said we're not going to – you know what we told you before. I thought it was basically – I didn't really get it. Maybe I missed it. I thought what happened was that basically he had to leave because he didn't have – he was told he didn't meet the requirement of the college education. Your Honor, Mr. Brooks didn't have that either. If you read the job specifications it says college education or the equivalent. I mean, couldn't he just look at that and say, well, I've got the equivalent, what's your problem? Exactly. Why was he called to the meeting? Why was Ms. Dougherty brought to a meeting with Deputy Commissioner Hammond and told you're going to have to tell Roland that he's not going to be able to maintain the position? And why did he resign? I mean, that was a voluntary decision. And then he says, I resigned because of stress, because it was stressful. I think that's the city's argument, that he agreed that the position was stressful, Your Honor. I thought that was part of the record. He said – I think it's in record page 96, he gives his exact recounting of what happened, that he was told that they're not going to waive the educational requirement for him. And this man doesn't even have a GED. But more to Judge Roth's point, why didn't he say, you know, I have the qualifications because I've been at this job for something like 10, 15 years. And the regulation does say or equivalent skill or experience. But his decision was, I'm going to leave, I'm going to resign. But, Your Honor, this specific issue of education was brought up at the outset. So when he first went into the position after Mr. Filler died, the question was raised, I don't even have my GED, we're going to work around it, no problem. And then for whatever reason, Deputy Commissioner Hammonds brings in his boss, Ms. Dougherty, and says, you've got to go tell him. Why? Just leave it alone. If it isn't a specific attempt to get him out. So why doesn't he say, well, that's a lot of hooey because I've got the requisite experience, it says right here. And he never, I mean, if he doesn't understand what that's all about, is that even an indication of his qualifications for the job? I think everyone who ever looked at the general product shop, and he was really more of an operational person, let's say he was one of the best shops in Filled Court. And he held that position for a very long time. And I think to say it was voluntary when he's told, you're not going to be able to stay in the position, Roland, we're going to insist on that college requirement. I don't think that's voluntary, Your Honor. But the college requirement isn't there if you've got the experience. Why doesn't he say that? It's some equivalent combination. We can parse words there. It's some equivalent combination. Probably when he's told he's going to need college, which is what he was told, did he object and say, no, I don't, under the regulation? He didn't, Your Honor. Is that the basis for the constructive distrust? I mean, is that the heart of it, that he was told you need a college education? He concludes, I don't have one, therefore. That they're not going to waive the educational requirement, Your Honor. I'm sorry? That they weren't going to waive the educational requirement the way he was told at the outset. But he never argues to them that they should. We had a meeting with Ms. Dougherty. And did he tell her, well, yeah, I've got the equivalent? Right here it says that I'm qualified. He did not, Your Honor. He did not. He slunk down into seat, I guess, and said, you told me you were going to waive it, and now you're not. You know, I'm not going to stay in the job. I don't have a chance of becoming, instead of acting assistant director, the actual assistant director. And then for whatever reason, Mr. Brooks is put in the position, has two college courses, I believe, and then eventually becomes the director of Fellow Corps. That's troubling. Well, you know, the thing that troubles me is the only indication I see of any discriminatory actions is Mr. Stuckey's inability to have a supervisor who's African-American. In other words, he's the one who doesn't like working Mr. Brooks, that he says Brooks is always sneaking up on me, that Brooks is trying to pin something on me, that there are people who say that Mr. Stuckey discriminates against African-Americans. Mr. Stuckey's supervisor really was Ms. Dougherty, and the record's replete with references to once Mr. Brooks became the acting assistant director, that Ms. Dougherty was removed from the equation. And there was – Donna Reed Johnson gave this testimony that she thought that Mr. Stuckey had a report directly – I'm sorry, Mr. Brooks reported directly to Commissioner Hammond and not to the director of Fellow Corps that he directly worked for. So he did work for a Caucasian boss, Ms. Dougherty was Caucasian, but for some reason Deputy Commissioner Hammond and Mr. Brooks sort of eliminated Ms. Dougherty from that equation, and there was testimony from a few different people to that effect. And that the way that Mr. Brooks approached Mr. Stuckey in his shop, holding the keys and taking the computer, there was – the computer was taken from him and it was put in an office empty. It's not like someone else needed it or there was – Ms. Dougherty said it was put in an office and left to be empty. It seems so silly and so petty. I mean, was there any explanation for that? There wasn't, Your Honor. There wasn't. I mean, someone did offer – Deputy Commissioner may have mistakenly believed it belonged to the assistant director, but it was actually – Other than reinstating the policy that a person in this position should have a college degree, did the city press Mr. Stuckey to resign in any other way? I mean, was there any pressure? None other than being called to the meeting with Ms. Dougherty. So the only thing was that they informed him that the position requires a college degree. You're going to have to require a college degree. That was present before, wasn't it? I mean, that – he knew that from several months before. But no, because he was told – he was told they were going to waive it. That's the whole factual underpinning for him even moving into the assistant director position. He was told they were going to waive it, and then for an unknown reason – He didn't have a high school degree either, did he? He did not, Your Honor. He did not even have his GED. He just done, you know, that job in 19 years' perfect attendance in the prison. No one has that in the prison, 19 years' perfect attendance in the prison, which is also why the retaliation claim is so severe. The essence of the constructive discharge is they told me the position required a college degree. They told me they were – yes, in the end. They told me they were going to waive it for me because of my experience. They told me they were going to waive it, and then they called me to a meeting at which my boss says, I'm sorry, the deputy commissioner is now saying we're not going to waive it. We're not going to be able to work around it. My review of the record said he resigned because he was – he thought it was really stressful. Now, you say that that doesn't appear in the record. There's a mention – supposedly there's two different recollections. There's one recollection that there's a meeting, and then Dougherty and Stuckey say there wasn't a meeting that was attended by the deputy commissioner and or Mr. Brooks I think at some point. I think there is some place in Stuckey's deposition testimony where he said it was a stressful position. He did say that at some point. That's not a misstatement for the appellee to say that. But he says, page 96 of the Joint Appendix, exactly what he was told by Ms. Dougherty, that Roland, we're not going to be able to work around that education requirement we told you about. And I think that changes the fabric of that position. He was told it's not going to be a problem. You've been here for 15-some years in Philicore. You run a good shop, and we're going to let you be the assistant director and do operational stuff. And then he's called into a meeting. Why? Especially with the comments that were eventually made. And I understand that the city's attempt to isolate that comment and to say, well, that was made later. But it belies Deputy Commissioner Hammond's mindset, I think. And that's really the crux of it. Deputy Commissioner Hammond was looking to groom Mr. Brooks for this position. That's what he wanted to do. He wanted to give Brooks the experience that Stuckey already had. And I think he makes out his claim for constructive discharge respectfully. Any evidence of racial animus in this case against Mr. Stuckey? Any evidence of outrage? Well, yeah, Donna Marie Johnson's comment. Say that again. Donna Marie Johnson's comment from Deputy Commissioner that they were romantically involved. And she recalled that Deputy Commissioner Hammond had said about Mr. Brooks that he was looking out for a brother. That had to do with him attending a program, didn't it? That didn't have to do with his. No, no, no. No, the program thing was he went to a correctional seminar down in Washington or something like that. But that wasn't, no, it was more general than that. Ms. Johnson theorized that he wanted to make sure he was getting all the training and experience that he needed. And I think the Deputy Commissioner said that the reason he was attracted to Brooks so greatly was that he did a good job at that seminar. But interestingly, all those materials were prepared by Ms. Dougherty, and that's also in the record. But Brooks, I mean, Stuckey said in his deposition that there had never been any. Outright slurs toward him, yes, no. The only place you get that is from Donna Marie Johnson. So, I mean, if Stuckey says there have been none, where do we find it? Well, because of the connection between Deputy Commissioner Hammond and Mr. Brooks. There is this, in the words I think it was the Amman Court, this complex tapestry here. Your argument is he was constructively discharged on account of race. Yes, Your Honor. But the record doesn't seem to show any animus points. Because when you compare Brooks and Stuckey, Stuckey's got more experience. They have the same education, in effect. I mean, the fact that one is African-American and one is white is enough to show constructivism? Well, if you construe the facts in the light most favorable to the non-moving party, taken with what Donna Marie Johnson says, taken with the things that happened to Stuckey once he became a guard, what they did to him. Well, they did to him, though, but all of our cases, they talk about hostile environment. And those are pretty consistent and persistent and egregious actions that make the they so poison the employment well that it's just impossible to drink from it anymore and you've got to get out of there. And in that context, again, I mentioned what I thought about the disparate treatment claim based upon that one comment that you have from Hammond that Johnson said. But I don't know how that gets you anything else. I don't know how that gets you the circumstances of the workplace. It didn't change the conditions of the employment, which is, I guess, the language we often use. It was a pain, and he may have had a supervisor, Brooks, come in, and Brooks may have been incredibly obnoxious, but my God, so many obnoxious bosses around the world. And it almost looks more like Stuckey was obnoxious to Brooks than Brooks was obnoxious to Stuckey. I think Mr. Stuckey's sentiments in that regard were because of the way that the position changed and also because of what Brooks seemingly did once Stuckey was back in his general product shop, you know, with holding the keys and making sure that the door didn't click when he came in and, you know, then taking the computer. I think that all built. I think that built up and built up and built up. You know, and Stuckey didn't see any other reason than race as being the reason for the switch because, unfortunately, Mr. Brooks didn't have a college degree. He had two courses in community college, I believe. So that's how it appeared to Stuckey. Thank you. Good morning, Your Honor. Good morning. May it please the Court, my name is Michael Angelotti. I represent the City of Philadelphia, the appellee here. Your Honor, we're asking this Court to affirm the District Court's grant of summary judgment on all three counts. Your Honor, what about the comment that Hammond reportedly made? Donna Johnson apparently said that. Yes, Your Honor. She was told I was looking out for her brother. Yes, Your Honor. Summary judgment. Now, maybe a jury might find all kinds of ways to explain the context of that or put it into context, but in summary judgment, couldn't a juror conclude that that suggests a bias? No, Your Honor. Okay, why not? No, Your Honor. Your Honor, I'd like to mention a quote from the Hammond case, Hammond v. Court Furniture, in which the Court's talking about words that are looked at from the record. The Court says that words are only relevant, the actual words are only relevant, insofar as they determine the intent of the speaker. And, Your Honor, when you look at the record in this case and on the page that this comment comes up on in Ms. Johnson's deposition, it's abundantly clear that she's talking about Mr. Brooks going to training. She said Deputy Commissioner Hammond had wanted to look out for her brother, and the context in which that came up was Mr. Brooks attending conferences and attending this training. And it's once Mr. Brooks already had the job that these things occurred. It wasn't a way to force Mr. Stuckey out. It wasn't anything to do with Mr. Stuckey quitting his job. And it's on page, I believe, in the record where Ms. 132, I believe, page 132 of the record, she's indicating that Deputy Commissioner Hammond wanted Mr. Brooks to succeed, and this is in context of the training. And there's nothing before that in the time period of when Mr. Stuckey still had the job of acting assistant director. The jury could find that, but you also have the context where he's told he can't have the job because he doesn't have a college education. The person who took the job before him and after him did not have a college education. Now, arguably, he didn't have a GED either, which doesn't help his argument at all in front of a jury. But given that, the fact that the person before him who was black didn't have a college education, the person after him who was black didn't have a college education, and then you have this statement, which you're explaining away. Why couldn't a jury look at that and conclude that, no, what's happening here is really disparate treatment to Stuckey? Your Honor, Mr. Filler, who held the position of assistant director before Mr. Stuckey was Caucasian, and he didn't have the college degree. So there's nothing indicating that a Caucasian. But Brooks didn't hire him, did he? I'm sorry, Your Honor. Brooks was not who? The person responsible for hiring Stuckey and not hiring him was Brooks. Who was the person who was making the decision, the hiring decision for Stuckey? Oh, Ms. Doherty, who was the director of the court, looked at Mr. Stuckey, and when they were looking for an acting assistant director to fill the position vacated when Mr. Filler died, she's the one that picked Mr. Stuckey. She made the recommendation, but she didn't make the decision, did she? No, Your Honor. She made the decision. I believe Deputy Commissioner Hammond made the decision, Your Honor. Okay. The ultimate authority. Who hired the person before Stuckey got in position? Was that Hammond also? Your Honor, the record doesn't reveal who the hiring authority was. It's my understanding from the record that Mr. Filler, who was in the job before, was there for quite some time. So I'm not sure. The record doesn't talk to who hired him. When Stuckey stepped down, did Hammond decide who his successor would be? No, Your Honor. Ms. Brooks went out and looked for applicants to fill the job left when Mr. Stuckey stepped down. Interesting, she talked about when she first looked for an acting assistant director, she said that Mr. Brooks was actually her second choice. So Mr. Brooks was waiting in the wings. Well, now, the person who succeeded in the shop, Gallagher, was that his name? Yes, Your Honor. Who hired him? Ms. Doherty put Mr. Gallagher into position. And did he have a college degree? No, Your Honor. Well, the record doesn't reveal that he did, Your Honor. I thought it revealed that he didn't have one. I believe, yes, Your Honor. I mean, looking at the facts, favorably to Mr. Stuckey, Your Honor. What's his name? Mr. Stuckey, Your Honor. Yeah. Brooks was extremely hostile towards him. It just seemed like he was out to get him. Looking at the facts, favorably to the plaintiff. And then given the Pennsylvania Civil Service Commission overturned Stuckey's discipline and rejected Brooks' testimony, why isn't that enough evidence to support the notion that Brooks, that there was a discrimination here? Your Honor, the Civil Service Commission determined that the city didn't meet its burden to prove that the incident was sufficient to fire Mr. or to demote Mr. Stuckey at the time. Interestingly, before the board, prior to the Civil Service Commission hearing, Mr. Stuckey actually admitted to all of the incidents. Mr. Stuckey also admitted to the incidents in a letter to the prison commissioner, Your Honor. So he doesn't challenge in the record that these incidents occurred. And there were incidents which preceded his outburst towards Mr. Stuckey where he eventually received the employee violation report. There were three different incidents in the record where Mr. Stuckey conducted these outbursts. And Deputy Commissioner Hammond, I believe, is the one that likened them to workplace violence. So it appears that Mr. Stuckey had this temper that would flare up all the time. And even Captain Angelucci, who was deposed later, said that he worked with Mr. Stuckey way back in 1992 and 1993, I believe. And he indicated at that time he knew Mr. Stuckey to be a hothead. So these are issues that would come up. Mr. Stuckey would have these outbursts, and eventually he was disciplined for them. The discipline was overturned. Mr. Stuckey himself has admitted to these outbursts and to this conduct in the record, Your Honor. So the choice of discipline at the time may have been overturned, but eventually something would have happened. Ms. Doherty talks to this as well. She doesn't believe that Mr. Brooks's choice of discipline was correct, but she did say that there should have been progressive discipline at the time. So she conceded even then that some discipline was appropriate, Your Honor. Your Honor, interestingly, Mr. Stuckey, I would be inclined to agree with the Court's position that Mr. Stuckey really doesn't point to anything in the record that shows that he was asked to step down from the acting assistant director position. Up until this point, did he have a bad record? Stuckey? Not a bad record, Your Honor. I mean, it seemed like he'd been there for 20 years. He had an excellent attendance record, great experience, and had been rising up through several ranks. His employee of the year? One year. Yes. All of a sudden, he's out. Your Honor, not necessarily that he's out. He quit. He stepped down, Your Honor. He decided not to continue in the position. He claims he had no choice, but the standard for a constructive discharge is whether a reasonable person in that position would have felt no choice but to step down. Your Honor, he was never told he had to step down. He was never told he wasn't going to get the job eventually. He was told they weren't going to change the specifications for the job, but there was no indication of when they were going to fill that job. And, in fact, Mr. Brooks … Why can't we consider the constructive discharge, the fact that he was pretty much told that he wasn't going to get that job, and then the incidents that occurred subsequent, especially concerning Mr. Brooks? Your Honor, I think it's important to note that he didn't have the job yet. He was only acting assistant director. He had never actually received the job of assistant director. And there's no indication in the record for him to form a basis of when he might not be placed in that position of acting assistant director. In fact, Mr. Brooks was in the position of acting assistant director for three years. So this could have lasted, as far as he knew, for an indefinite period of time. And Mr. Brooks was in the position of acting assistant director until he eventually applied for and got the position of director at FiliCorps. So there's no indication that they were in any hurry to get rid of him. They just said that eventually they would have to keep the specifications for the job and advertise it to the outside. Do you have any recollection of the record? It seems like I saw it somewhere. Stuckey said that he resigned because of stress. Yes, Your Honor. It's on page 601 of the record. It's where Ms. Doherty's – it's during her deposition where she indicates that Mr. Stuckey said that if he wasn't going to get the job permanently, then he didn't want it. And she said it was pretty stressful. So she was recounting her conversation with Mr. Stuckey at the time. What was stressful, the fact that he didn't know what he was going to do or the fact that he was going into a stressful job? The job itself, Your Honor. She's describing why he stepped down from the position. The impression that it gives is that the job of acting assistant director is a stressful job. And I can understand how it would be. The acting assistant director sort of keeps track of all the different industry shops within Fillicorn, has to go and make sure everybody's on top of their – What page is it on? Page 601, Your Honor, of the Joint Appendix. Your Honor, aside from the constructive discharge claim, which we don't believe the appellant makes out, we also feel that the conduct here was not severe or pervasive in order to meet the standard for a hostile workplace. And I think this court pointed out the fact that the only real activity was the moving of the computer, Your Honor. And that's explained in the record. Ms. Doherty actually explains that. She said that Deputy Commissioner Hammond just had his facts mixed up. He thought that the computer was for the assistant director of Fillicorn. And at that point, Mr. Stuckey had been demoted down to an industry shop supervisor again. So they moved the computer to another location. They moved it back after a month after they realized their mistake. Wasn't there some problem with the district court saying that some of these incidents that he was complaining about should not be considered in evaluating a hostile work environment? And one of those was the moving of the computer. And I don't know why that shouldn't be considered. Your Honor, I think one of the most important points about the moving of the computer is the fact that Mr. Stuckey never explains how that affected his job. So he complains that his computer access was denied for a month, but he never really says this affected my job performance. Do you know why that was done? I'm sorry, Your Honor? Do you know why that was done? The only explanation in the record, Your Honor, is when Ms. Doherty indicates that Deputy Commissioner Hammond thought that the computer was for the assistant director position and had it moved to a different location, and then they moved it back after they realized their mistake. It strikes me that anybody whose job is such as to allow someone to authorize them to have a computer, if that's what your job entails, it would pretty much be impossible to do, and maybe it's just because of the way I work, but it would be pretty much impossible to do the job without the computer if you're that dependent on it that the job's going to pay for it and give you one. I don't know how you could then do the job that the job said. In order to get the computer, it seems to me common sense, would suggest someone in a position of authority has made a decision, you need the computer to do your job, therefore we're going to buy a computer or give you a computer. Well, if that's the case, if you don't have the computer, how can you do your job? Your Honor, I think in today's workplace, we expect to see computers. A lot of times if you walk into an office, the first thing you look for is a computer when you walk in because you want to know what everyone has said. Because you can't do the job without one. It's gotten to that point. But, Your Honor, You can't do anything without a computer. Your Honor, Mr. Stuckey never makes out in his My colleagues get along just fine without one. I like a quill pen myself. Your Honor, in an office environment, there could be lots of different pieces of furniture which are there, which we think we couldn't get along with. There could be several seats. There could be a bookcase, a plant, anything in the office. Do any of them receive email? No, Your Honor. Like a magic sofa? No, Your Honor. But in this case, furniture might be more important to some people's jobs, Your Honor, than a computer if part of their job is to have people come in and to counsel them on what they're doing within their certain industry shop. Mr. Stuckey never says in the record in his argument in this case how that affected his job performance, how the moving of the computer affected his job performance. He only says that computer access was denied. But if they moved a different piece of furniture, a chair or a plant or the desk or something, and he doesn't explain how that affected his job performance, Your Honor, that's not severe treatment under the hostile workplace analysis to rise to the level it needs to. And, Your Honor, importantly, there's no indication anywhere in the record that the moving of the computer is based on race. Your Honor, Mr. Stuckey points to nothing that indicates that the moving of the computer was based on race. So even if it were severe, which he doesn't explain how it would be, it's not based on race. It fails both parts of the hostile workplace environment test, Your Honor. So there's nothing that really he can point to in the record to indicate that. Your Honor, I'd like to address briefly, if I may, the retaliation claim. The district court in this case indicated that there's really only one basis on which Mr. Stuckey can rest his retaliation claim, his threat to file a lawsuit to Mr. Brooks in one of these confrontations that he had with him. Your Honor, the district court indicated that Mr. Stuckey waived his argument concerning his Pennsylvania Human Relations Commission complaint because the only time he raised it was in the surrepli. Your Honor, we would ask that this court affirm that decision because, you know, even if that's not waived, there's no causation in this case between Mr. Stuckey's filing of the PHRC complaint and anything that happened to him subsequently. Your Honor, importantly, that leaves him with the threat to file a lawsuit against Mr. Stuckey. He went in and his words with Mr. Brooks were not anything based on race, were, look, you got the job over. I got the job.  I don't have college. I'm going to file a lawsuit. Now, this is the extent of it. He didn't complain anything. You know, you cited Amman before. Isn't that exactly the kind of situation that Amman says we should be very, very careful in today's context when people are sensitized to the fact that you don't discriminate in the workplace? We need to be particularly cognizant that bias and discrimination will rear its ugly head in very, very subtle ways. If you're in a situation where a white person is talking to a black employee, a white person doesn't have a college education, he knows that the person before him doesn't have one who is black. The person after him, apparently, the person after him who got the job when he sat down didn't have one who was black. And the white person says, I'm going to file a lawsuit. In this day and age, wouldn't anybody know what he's talking about? No, Your Honor. And you don't harm me because I'm white. No, Your Honor. And, in fact, the individual in the position before Mr. Stuckey was also Caucasian, Mr. Feller. So there was a white guy that had the position before Mr. Stuckey had it. And Your Honor, it was actually the author of a case, Barber. Yeah, I misspoke. That's right. He didn't have a college education. That's right. Correct, Your Honor. Yes. The person who died when Stuckey stepped down was black, who didn't have a college education. Stuckey says, I told him I'm going to file a lawsuit. And that's basically right. That's what he says during that exchange. Right. Doesn't Amon suggest that we should interpret that exchange? Your Honor, I think the more apt case is the Barber case, in which Your Honor wrote the opinion back in, I believe, 1995, indicating that, look, there has to be some specificity to the claim. In that case, it was an age-based claim. And the individual worked for the railroad and applied for a position. And there were several other people that applied for the position. But the context in Barber was very different. And the main focus in Barber, because it hadn't been decided by the Supreme Court yet, was whether or not someone could bring an ADEA claim where the person that took the job was also old enough to be in the protective class but younger than the person who was alleging age discrimination. That was the focus of the inquiry. And the kind of subtlety that we're talking about here in the way Amon suggests we should look at these kinds of discussions, I'm not sure that's warranted because of the discussion in a different context than Barber. The point is well taken, Your Honor. I would argue that even under Amon, I think the conduct that occurred under Amon was incredibly pervasive. And it happened over a period of several years, I believe from 1986 to 1982. And there were the two plaintiffs in Amon who the record was just full of references about racial animus that occurred. And there was no undertones. It was very overt in that case. They talked about Lincoln freeing – there was a comment where, hey, did you hear Lincoln free the slaves? And the white employees refused to work with the black employees. And the African-American employees were given menial tasks. So, Your Honor, the conduct in Amon was very different from the conduct in this case. In this case, the only thing that happened is Mr. Stuckey stepped down after finding out that eventually they were going to advertise the position and not change the specifications. So there's nothing here. There's no there there in this case, Your Honor, as opposed to the Amon case where the record is just full of references to the plaintiff's race and things that happened to them because of race. And here, Your Honor, the record just isn't there. There's no factual basis for the court to make a logical inference that this occurred based on race. Okay. Let's have a list of other questions. We understand the argument. Thank you, Your Honor. Thank you. We'll just have you use your four minutes. I've got to write this time. Yes, Your Honor. Just to go back to the computer issue, Your Honor. There's stuff in the record that indicates what happens is in the general product shop where he worked, they make a lot of mattresses and pillows and things of that sort, and they keep their inventory on the computer. Because there was this tension between Brooks coming in when he was holding his keys. Like, why is he coming in? Because it's all in the computer reports. So Stuckey's shop would generate computer reports every week or every month, whatever it was, about how many mattresses were being made and what was being taken out of stock and stuff like that. So it was very much part of his workplace, that computer. And then, again, back to the question, what use was made to it? It was taken and just put in an empty office, and no one was using it. I think that's terribly important. Is that the primary industry there is making mattresses? That was one of the big ones, yeah. There was this whole thing about they made this special, and only Stuckey could do it apparently, where they would make this pillow inside the mattress thing. I think many years ago I think I had one of those mattresses. That explains a lot. After Stuckey left general products, they weren't able to do that anymore. He was able to sew, teach the inmates how to sew in a special way. So that was sort of the deal. And with regard to Mr. Gallagher, I just want to correct one misunderstanding. He never came up higher than industry shop supervisors. He never took the assistant director role. Once Mr. Stuckey was out, then assistant director Brooks became the director, and then Anthony Newman came in as assistant director. And Mr. Newman is African American. I think the other important thing is you have Donna Johnson. Do you have a college education, Newman? Yes, he does actually. I think Mr. Newman, he has at least a bachelor's, if not a master's degree. And Donna Johnson and Dougherty both point to this thing that happened after Mr. Brooks went into the position. That basically the director, which was Ms. Dougherty at the time, was eliminated. She wasn't called to meetings. It was Hammond and Brooks, as though there was a direct line of authority in the hierarchy at work, which there wasn't. There was a director in between them. And they both pointed to that. And I would go back to exactly what Your Honor said about the almond court. The sophisticated would-be violator has made our job a little more difficult. Today we must be increasingly vigilant in our efforts to ensure that prohibited discrimination is not approved on the auspices of legitimate conduct, and a plaintiff's ability to prove discrimination indirectly, circumstantially, must not be crippled. And I think that's the point here, is that at a summary judgment stage, this district court's decision can't be upheld. Let me go back to a point I made once before. Mr. Angelotti has now given me a specific reference to a statement that apparently is attributable to Mr. Stuckey, which is I resign because of stress. So here it is on page 601 of the joint appendix, Your Honor. I asked the question of Ms. Dougherty, okay, well, what did he do after you told him that? What happened? Well, after I told him that, he told me that he wasn't going to continue the job, which was pretty stressful, actually. That's her characterization of what the assistant director's job was. She's not quoting what he said. If he had no chance of ever getting it permanently. So after I told him that, he told me that he wasn't going to continue the job, which was pretty stressful, actually, if he had no chance of ever getting it permanently. That says he told me that it was pretty stressful. He told me that it was pretty stressful. I'm sorry, he told me he wasn't going to continue the job, comma, which is pretty stressful, actually. I think that's her characterization of the job. And what was that after that? If he had no chance of ever getting it permanently. And that was his impression. That's what he was called to a meeting to be told. And the reason that there is stuff in the record to indicate that no one ever has an acting job for three years. That's in the record. They're always much shorter than that. He was left in the acting job so he could be groomed so that he could fill that, you know, equivalent experience. It's our position that Mr. Brooks was given that job for so long so that he could then assume the role of director, which he, in fact, did in this case. Thank you, Mr. Howell. Thank you. Thank you. We're taking that under advisement.